**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GRANDMOTHERS GROWING GOODNESS, and THE WILDERNESS SOCIETY, ) ) ) | |
| Plaintiffs, ) ) | Case No. 1:26-cv-513-AHA |
| v. ) ) | |
| DOUG BURGUM, in his official capacity as Secretary of the Interior, *et al.*, ) ) ) | |
| Defendants. ) ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
<u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 1

    A.      Statutory Background ............................................................................ 1

          1.      Naval Petroleum Reserves Production Act .................................. 1

          2.      One Big Beautiful Bill Act ......................................................... 3

          3.      Congressional Review Act ........................................................... 4

    B.      Factual and Procedural Background .................................................... 4

LEGAL STANDARDS ......................................................................................... 7

    I.      A Preliminary Injunction Is an Extraordinary Remedy ....................... 7

    II.      Administrative Procedure Act Review of Final Agency Action ........... 7

ARGUMENT ....................................................................................................... 9

    I.      Plaintiffs Fail to Show a Likelihood of Imminent, Irreparable Injury .... 9

    II.      Plaintiffs Are Unlikely to Succeed on the Merits ................................ 14

          A.      The Agency Decisions Did Not Rest on a "Misinterpretation" of the OBBBA ............................................................................ 15

          B.      Plaintiffs Misapprehend the OBBBA and the Petroleum Reserves Act ...................................................................................... 19

    III.      The Balance of Equities and Public Interest Favor Defendants ........... 22

    IV.      Any Injunction Must Be Narrowly Tailored ....................................... 23

CONCLUSION .................................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Bioscience, Inc. v. Thompson*,
   243 F.3d 579 (D.C. Cir. 2001) ................................................................. 14

*Am. Radio Relay League, Inc. v. FCC,*
   617 F.2d 875 (D.C. Cir. 1980) ................................................................... 8

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
   271 F. Supp. 2d 230 (D.D.C. 2003) ........................................................... 8

*Amoco Prod. Co. v. Vill. of Gambell*,
   480 U.S. 531 (1987) ................................................................................. 11

*Blanco v. Burton*,
   No. Civ.A. 06-3813, 2006 WL 2366046 (E.D. La. Aug. 14, 2006) ......... 11

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) ................................................................................. 23

*Cal. Ass'n of Priv. Postsecondary Sch. v. DeVos*,
   344 F. Supp. 3d 158 (D.D.C. 2018) ......................................................... 10

*Camp v. Pitts*,
   411 U.S. 138 (1973) ................................................................................... 8

*Chamber of Com. of U.S. v. NLRB*,
   118 F. Supp. 3d 171 (D.D.C. 2015) ........................................................... 8

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) .............................................................. 9, 10

*City of Olmsted Falls v. FAA*,
   292 F.3d 261 (D.C. Cir. 2002) ................................................................... 9

*Cobell v. Norton*,
   391 F.3d 251 (D.C. Cir. 2004) ................................................................... 7

*Conner v. Burford*,
   848 F.2d 1441 (9th Cir. 1988) ................................................................. 12

*ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n*,
   660 F. Supp. 3d 822 (D. Alaska 2023) ....................................................... 2

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
   141 F.4th 976 (9th Cir. 2025) ................................................................. 20

*DSE, Inc. v. United States*,
   169 F.3d 21 (D.C. Cir. 1999) ........................................................................ 24

*eBay Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006) ...................................................................................... 22

*\*Gwich'in Steering Comm. v. Bernhardt*, No.,
   3:20-cv-204-SLG, 2021 WL 46703 (D. Alaska Jan. 5, 2021) ........................ 10, 11, 12, 13, 23

*Hall v. McLaughlin*,
   864 F.2d 868 (D.C. Cir. 1989) ........................................................................ 9

*Lomak Petroleum, Inc. v. FERC*,
   206 F.3d 1193 (D.C. Cir. 2000) ...................................................................... 9

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ...................................................................................... 8, 9

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ........................................................................................ 8

*N. Alaska Env't Ctr. v. Kempthorne* ("NAEC I"),
   457 F.3d 969 (9th Cir. 2006) ......................................................................... 1, 20

*N. Alaska Env't Ctr. v. U.S. Dep't of the Interior* ("NAEC II")
   983 F.3d 1077 (9th Cir. 2020) ........................................................................ 2, 20

*\*Nat'l Audubon Soc'y v. Haaland*,
   No. 3:20-cv-206-SLG, 2023 WL 5984204 (D. Alaska Sept. 14, 2023) .................. 3, 4, 5, 6, 11

*Nat'l Petrochemical & Refiners Ass'n v. EPA*,
   287 F.3d 1130 (D.C. Cir. 2002) ...................................................................... 9

*Nken v. Holder*,
   556 U.S. 418 (2009) ...................................................................................... 22

*North Slope Borough v. Andrus*,
   486 F. Supp. 326 (D.D.C. 1979) .................................................................... 12

*North Slope Borough v. Minerals Mgmt. Serv.*,
   No. 3:07-cv-45-RRB, 2007 WL 1106110 (D. Alaska Apr. 12, 2007) ................ 11

*PPL Wallingford Energy LLC v. FERC*,
   419 F.3d 1194 (D.C. Cir. 2005) ...................................................................... 8

*Prill v. NLRB*,
   755 F.2d 941 (D.C. Cir. 1985) ........................................................................ 17, 18

*Pursuing Am.'s Greatness v. FEC*,
   831 F.3d 500 (D.C. Cir. 2016) ........................................................................ 22

*Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*,
   No. 20-cv-3817 (CKK), 2021 WL 430054 (D.D.C. Feb. 7, 2021) .................... 14

*Sierra Club v. Peterson*,
 717 F.2d 1409 (D.C. Cir. 1983) ............................................................................. 12

*\*Sovereign Iñupiat for A Living Arctic v. Bureau of Land Mgmt.*,
 3:23-cv-58-SLG and -61-SLG, 2023 WL 2759864 (D. Alaska Apr. 3, 2023) ................ 13, 22

*\*Sovereign Iñupiat for A Living Arctic v. Burgum*,
 No. 3:25-cv-356-SLG, 2026 WL 215560 (D. Alaska Jan. 27, 2026) ........................ 21

*Tribal Vill. of Akutan v. Hodel*,
 859 F.2d 662 (9th Cir. 1988) ............................................................................... 11

*Trout Unlimited v. U.S. Dep't of Agric.*,
 320 F. Supp. 2d 1090 (D. Colo. 2004) .................................................................. 8

*Trout Unlimited v. U.S. Dep't of Agric.*,
 944 F. Supp. 13 (D.D.C. 1996) ....................................................................... 8, 20

*Trump v. CASA, Inc.*,
 606 U.S. 831 (2025) ........................................................................................... 23

*United States v. Ross*,
 848 F.3d 1129 (D.C. Cir. 2017) ........................................................................... 17

*Univ. of Tex. v. Camenisch*,
 451 U.S. 390 (1981) ........................................................................................... 10

*WildEarth Guardians v. Salazar*,
 741 F. Supp. 2d 89 (D.D.C. 2010) ....................................................................... 9

*\*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) .................................................................................... 7, 21, 22

*Wisc. Gas Co. v. FERC*,
 758 F.2d 669 (D.C. Cir. 1985) ........................................................................... 10

*Zevallos v. Obama*,
 793 F.3d 106 (D.C. Cir. 2015) ............................................................................. 8

**Statutes**

42 U.S.C. § 6504(a) ................................................................................................ 3

43 U.S.C. § 1732(a) ................................................................................................ 2

5 U.S.C. § 706 ...................................................................................................... 15

5 U.S.C. § 706(2)(A) ............................................................................................... 8

5 U.S.C. § 801(b)(2) .............................................................................................. 21

5 U.S.C. § 801(f) .................................................................................................... 4

5 U.S.C. §§ 701-706 ............................................................................................... 7

5 U.S.C. §§ 801-808 ............................................................................................................ 4

Pub. L. No 119-21, 139 Stat. 72 (July 4, 2025) .................................................................. 3, 15

Pub. L. No. 94-258, 90 Stat. 303 (April 5, 1976) ................................................................. 2

Pub. L. No. 96-514, 94 Stat. 2957, 2964-65 (December 12, 1980) ....................................... 2

### Regulations

43 C.F.R. Part 3130............................................................................................................ 11

### Other Authorities

90 Fed. Reg. 48446 (Oct. 22, 2025)..................................................................................... 6

90 Fed. Reg. 51470 (Nov. 7. 2025)...................................................................................... 2

91 Fed. Reg. 6248 (Feb. 11, 2026) ...................................................................................... 7

## INTRODUCTION

Plaintiffs contend they will be irreparably harmed if this Court does not enjoin the Department of the Interior from opening bids on March 18, 2026, for an oil and gas lease sale in the National Petroleum Reserve in Alaska ("NPR-A"). This request parallels the one made in a similar motion for preliminary injunction filed by the Plaintiff in *Nuiqsut Trilateral, Inc. v. Burgum*, No. 26-cv-239-AHA, also assigned to this Court. But Plaintiffs' posturing ignores prior rulings in the District of Alaska holding that the mere issuance of oil and gas leases does not warrant preliminary injunctive relief. And their choice of venue seeks to avoid the considerable involvement of the Alaska district court and the Ninth Circuit in long-running related litigation, as well as counsels' collective efforts at docket management in those related cases. Despite being aware of that litigation, Plaintiffs opted to create the burden of a fast-burning motion for preliminary injunction on this Court's docket.

The Court should not reward these efforts. Defendants have moved in both cases to transfer venue to the District of Alaska. And the Court should grant those motions while denying the motions for preliminary injunction without prejudice to refile them on the Alaska court's docket. If the Court decides to further engage these improvidently filed motions for a preliminary injunction, it should deny them. A preliminary injunction is an extraordinary remedy, and it is unwarranted here.

## BACKGROUND

### A. Statutory Background

#### 1. Naval Petroleum Reserves Production Act

The 23.6 million acre NPR-A was originally established by executive order in 1923 as the Naval Petroleum Reserve #4. *See N. Alaska Env't Ctr. v. Kempthorne* ("*NAEC I*"), 457 F.3d

1

969, 973 (9th Cir. 2006). In 1976, Congress enacted the Naval Petroleum Reserves Production

Act ("Petroleum Reserves Act"), Pub. L. No. 94-258, 90 Stat. 303, transferring administrative

jurisdiction to the Secretary of the Interior and redesignating the area as the "National Petroleum

Reserve in Alaska." Congress provided certain directives within the Petroleum Reserves Act,

including establishing oil and gas exploration activities as a management priority. *See* Final

Rule, 90 Fed. Reg. 51,470, 51,471 (Nov. 7, 2025). "[A]s a result, [the Petroleum Reserves Act]

is considered a dominant-use statute." *Id*. That is, BLM does not manage the NPR-A for

"multiple use and sustained yield," *Id.*, as it does for most other public lands under the Federal

Land Policy and Management Act of 1976. *See* 43 U.S.C. § 1732(a).

To address the 1979 oil crisis and quickly move from federal to private oil development,

Congress amended the Petroleum Reserves Act in 1980, directing the Secretary to undertake "an

expeditious program of competitive leasing of oil and gas in the [NPR-A]." Dep't of the Interior

Appropriations Act for Fiscal Year 1981, Pub. L. No. 96-514, 94 Stat. 2957, 2964-65 (1980); *see

also ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n*, 660 F. Supp. 3d

822, 834 (D. Alaska 2023). To that end, the Petroleum Reserves Act directs BLM "to lease . . .

land [in the NPR-A] to private entities for oil and gas development, while taking such measures

as BLM deems necessary or appropriate to mitigate adverse environmental impacts." *N. Alaska

Env't Ctr. v. U.S. Dep't of the Interior* ("*NAEC II*"), 983 F.3d 1077, 1081 (9th Cir. 2020) (citing

42 U.S.C. § 6506a). In carrying out this mandate, BLM initially prepares an Integrated Activity

Plan ("IAP"), which establishes a programmatic framework to guide land management at a broad

scale. *See NAEC II*, 983 F.3d at 1082 (describing "alternative proposals for a range of land

allocations, including different options for the percentage of lands that would be made available

for oil and gas leasing"). "BLM analyzes an IAP through an environmental impact statement

2

("EIS") prepared in accordance with [the National Environmental Policy Act ("NEPA")]." *Nat'l Audubon Soc'y v. Haaland*, No. 3:20-cv-206-SLG, 2023 WL 5984204, at *1 (D. Alaska Sept. 14, 2023).  BLM's action adopting a final IAP occurs in a Record of Decision ("ROD").  *Id.*  BLM has issued IAPs in 2013, 2020, 2022, and 2025.

Plaintiffs emphasize the Petroleum Reserves Act's provision that exploration within certain designated areas, known as "special areas," must address "maximum protection" of surface values to the extent consistent with other oil and gas exploration requirements.  *See* Mem. in Supp. of Pls.' Mot for a Prelim. Inj. 2-3, Dkt. 14-1 ("Pls.' Br.") (emphasizing that "[t]he statute uses mandatory language ('shall') and a superlative standard ('maximum')").[1]  But while this language directs the Secretary to assure the maximum protection of significant subsistence, recreational, fish and wildlife, or historical or scenic value within special areas, as determined by the Secretary, that protection applies only insofar as it is consistent with the requirements of the Petroleum Reserves Act for the exploration and production of oil and gas resources within the NPR-A.  *Id.*; 42 U.S.C. §§ 6504(a), 6504a(n)(2).

2.     One Big Beautiful Bill Act

The President signed the "One Big Beautiful Bill Act" into law on July 4, 2025.  *See* Pub. L. No 119-21, 139 Stat. 72 (July 4, 2025) ("OBBBA").  Section 50105 addresses the NPR-A,

---

[1]     The provision states in full:

Any exploration within the Utukok River, the Teshekpuk Lake areas, and other areas designated by the Secretary of the Interior containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value, shall be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve.

42 U.S.C. § 6504(a).

directing that "the Secretary shall expeditiously restore and resume oil and gas lease sales . . . in the areas designated for oil and gas leasing as described in the [2020] NPR–A final environmental impact statement and the [2020] NPR–A record of decision." *Id*. §§ 50105(b), 50105(a).  The Act further directs that "the Secretary shall conduct not fewer than 5 lease sales under the Program by not later than 10 years after the date of enactment of this Act," each offering at least 4 million acres, with the initial lease sale "not later than 1 year after the date of enactment of this Act." *Id*. (c)(1) and (c)(2)(B)(i).  And it requires that the Secretary, in conducting these lease sales, "shall offer the same lease form, lease terms, economic conditions and stipulations as described" in BLM's 2020 IAP ROD governing NPR-A oil and gas leasing. *Id*. (d).

      3.    <u>Congressional Review Act</u>

On December 5, 2025, the President signed a joint resolution into law disapproving the April 2022 IAP under the Congressional Review Act, 5 U.S.C. §§ 801-808.  *See* Pub. L. No. 119-47, 139 Stat. 696 (Dec. 5, 2025).  The joint resolution's passage means that the 2022 IAP "shall be treated as though [the 2022 IAP] had never taken effect." 5 U.S.C. § 801(f).  And that a new IAP "substantially the same as [the 2022 IAP] may not be issued." *Id*. § 801(b)(2).

**B.    Factual and Procedural Background**

The current IAP was adopted on December 22, 2025.  *See* NPR-A 2025 IAP ROD, Ex. 1 hereto (without Appx. C Maps, to reduce file size).  This followed a series of planning efforts including IAP RODs issued in 2013, 2020, and 2022.  *See Nat'l Audubon Soc'y*, 2023 WL

5984204, at *2-3 (D. Alaska, Case No. 3:20-cv-206-SLG).[2]  Organizational Plaintiffs challenged

the 2020 IAP ROD in the District of Alaska in the above-cited litigation, and recently amended

their complaint (now captioned *Center for Biological Diversity v. Burgum*) to challenge the 2025

IAP ROD.  *See* Pls.' & Fed. Defs.' Joint Mot. for Scheduling Order 2, No. 3:20-cv-206-SLG,

Dkt. 135, Ex. 2 hereto.  While every aspect of its "complex procedural history" is not relevant

here, the parties to that case have proposed a joint litigation schedule whereby the merits will be

fully briefed by July 2026.  *Id*.  The proposed schedule does not contemplate a motion for

preliminary injunction, but instead requests a decision by October 2026, "if possible, before

surface disturbing activities may be authorized for the winter of 2026-27 pursuant to the new

IAP or in newly leased areas[.]"  *Id*. at 3.

    The 2025 IAP ROD complied with the OBBBA's direction to review and restore the

NPR-A Oil and Gas Leasing Program consistent with the 2020 IAP.  *See* 2025 ROD at 2-3.  The

ROD was based on the analysis presented in the 2020 EIS, as supplemented by a 2025

environmental assessment ("EA") that BLM prepared to consider new circumstances and

information post-dating the analysis in the 2020 IAP EIS.  *Id*. at 3.  The 2025 IAP makes

approximately 18.6 million acres of BLM-managed land in the NPR-A available for oil and gas

leasing.  *Id*. at 4.  But any leasing is deferred for at least ten years on approximately 132,000

acres in the Teshekpuk Lake Special Area ("TLSA").  *Id*.  And the 2025 IAP includes other

TLSA refinements, such as adopting science-based modifications of the TLSA boundary to

include "additional area important to the Teshekpuk Caribou Herd for calving and insect relief

---

[2]      While there technically have been four separate IAPs over time, in substance there have
been only two.  The 2013 and 2022 IAPs are effectively the same in material respects, as are the
2020 and 2025 IAPs.  *See* 2025 ROD at 13.

habitat." *Id*. at 6.  The 2025 IAP "makes available more land in the [TLSA] for new leasing and infrastructure," explaining that "[i]mportant surface resources in the [TLSA] are protected with the lease stipulations outlined in K-1, K-4, K-6, K-7, K-8, and K-9, as well as a host of required operating procedures that apply throughout the [NPR-A]." *Id*.  These protections include activity buffers and no surface occupancy restrictions in the Caribou Herd Habitat Area and Movement Corridors.  *See id*. at B-12 to B-14 (Stipulations K-8, K-9).

On December 19, 2025, just before the 2025 IAP ROD was authorized, the Department issued a decision canceling the Teshekpuk Lake Conservation Right-of-Way ("TLCROW"). Among other things, the TLCROW prohibited "[i]ssuance of new oil and gas leases for lands within the Protected Property" that encompassed the TLSA.  *Nuiqsut Trilateral*, No. 26-cv-239 (AHA) Compl., Ex. A, Dkt. 1-1 at 7.  As explained in the decision, cancellation of the TLCROW was necessary, in part, because doing so allowed the BLM to issue an IAP that complied with the direction in the OBBBA to make the same lands available for leasing and under the same lease form, lease terms, economic conditions and stipulations described in the 2020 IAP ROD.  *See* Pls.' Mot. for Prelim. Inj., Ex. 20, Dkt. 14-22, at 6-7, 10.  The decision also explained that the Department was canceling the TLCROW under the Secretary's inherent authority to cancel authorizations made in violation of law because the TLCROW was unauthorized under the Petroleum Reserves Act.  *Id*. at 5.  Finally, the decision explained that the TLCROW violated the sub-delegation doctrine because it gave the Trilateral veto authority over oil and gas development and transferred the program for mitigating effects from oil and gas activities in a meaningful portion of the NPR-A from the Secretary to the Trilateral.  *Id.* at 7-8.

In October 2025, a Call for Nominations and Comments regarding the lease sale was published in the Federal Register.  *See* 90 Fed. Reg. 48446 (Oct. 22, 2025).  Other information

regarding the lease sale has been issued through BLM's website, including lease sale tract maps, shapefiles, and a Detailed Statement of Sale. *See* https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/leasing/regional-lease-sales/alaska#docs (last viewed Feb. 26, 2026). On February 11, 2026, a Notice of 2026 [NPR-A] Oil and Gas Lease Sale was published in the Federal Register. *See* 91 Fed. Reg. 6248 (Feb. 11, 2026). Sealed bids must be submitted by 4 p.m. AKST on March 16, 2026, and a public opening and reading of the bids will occur at 10 a.m. AKST on March 18, 2026. *Id.*

Plaintiffs filed this lawsuit on February 17, 2026. *See* Compl., Dkt. 1. On February 20, 2026, Plaintiffs filed the instant motion for preliminary injunction. *See* Pls.' Mot. for a Prelim. Inj., Dkt. 14.

## LEGAL STANDARDS

### I.    A Preliminary Injunction Is an Extraordinary Remedy

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. A preliminary injunction "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).

### II.    Administrative Procedure Act Review of Final Agency Action

Plaintiffs bring their claims under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), which governs the Court's assessment of the likelihood of success prong of the

preliminary injunction standard.  The APA empowers a reviewing court to "hold unlawful and

set aside" final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law."  5 U.S.C. § 706(2)(A).  "[J]udicial review of an administrative

decision" will not involve witness testimony or discovery practice, but "will be limited to the

administrative record."  *Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 19 (D.D.C.

1996), *transferred to,* 320 F. Supp. 2d 1090 (D. Colo. 2004).[3]

This "arbitrary and capricious standard" is a "highly deferential standard," *Zevallos v.

Obama*, 793 F.3d 106, 112 (D.C. Cir. 2015) (citation omitted), and "[t]he agency's decision is

presumed to be valid."  *Chamber of Com. of U.S. v. NLRB*, 118 F. Supp. 3d 171, 182 (D.D.C.

2015) (citing *Am. Radio Relay League, Inc. v. FCC,* 617 F.2d 875, 879 (D.C. Cir. 1980)).

Indeed, the APA "mandate[s] that judicial review of agency policymaking and factfinding be

deferential."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024).

"To survive review under the 'arbitrary and capricious' standard, an agency must

'examine the relevant data and articulate a satisfactory explanation for its action including a

rational connection between the facts found and the choice made.'"  *PPL Wallingford Energy

LLC v. FERC,* 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n v. State

Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)).  A reviewing court "will uphold [an

---

[3]    Plaintiffs have filed numerous declarations in support of their motion for preliminary
injunction.  Generally, in APA review of final agency action "the focal point for judicial review
should be the administrative record already in existence, not some new record made initially in
the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  However, Defendants
acknowledge that one of the limited exceptions to this rule involves evaluating irreparable injury
in the context of a motion for preliminary injunction.  *See Am. Rivers v. U.S. Army Corps of
Eng'rs*, 271 F. Supp. 2d 230, 247 (D.D.C. 2003).  Defendants, therefore, do not object to the
proffered declarations for that limited purpose.  But any reliance on those declarations for
arguments concerning Plaintiffs' likelihood of success on the merits is improper and should be
stricken.

agency's] findings, though of less-than-ideal clarity, if the agency's path may be reasonably discerned[.]" *WildEarth Guardians v. Salazar*, 741 F. Supp. 2d 89, 97 (D.D.C. 2010) (quoting *Hall v. McLaughlin,* 864 F.2d 868, 872 (D.C. Cir. 1989)) (alterations in original). "[T]he party challenging an agency's action as arbitrary and capricious bears the burden of proof." *City of Olmsted Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002) (quoting *Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193, 1198 (D.C. Cir. 2000)) (alteration in original). And "[e]ven assuming [the agency] made missteps . . . the burden is on petitioners to demonstrate that [the agency's] ultimate conclusions are unreasonable." *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 287 F.3d 1130, 1146 (D.C. Cir. 2002).

When reviewing agency action under the APA, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority[.]" *Loper Bright*, 603 U.S. at 412. To resolve the meaning of disputed statutory language, a court shall adopt the interpretation that the court, "after applying all relevant interpretive tools, concludes is best." *Id.* at 400. "Careful attention to the judgment of the Executive Branch may help inform that inquiry." *Id.* at 413.

## ARGUMENT

Plaintiffs' motion should be denied. Their failure to show irreparable injury is alone sufficient to deny their motion. The Motion should be further denied because Plaintiffs' arguments on the merits lack supporting authority, ignore a common sense reading of the relevant agency decisions, and fall far short of meeting the arbitrary and capricious standard.

### I.    Plaintiffs Fail to Show a Likelihood of Imminent, Irreparable Injury

Plaintiffs' motion should be denied because they fail to clear the "high standard" of demonstrating irreparable injury. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d

290, 297 (D.C. Cir. 2006) (recognizing that preliminary injunctive relief should be denied if a movant cannot show irreparable injury, notwithstanding the movant's showing under the other three factors).  Their injury "'must be both certain and great; it must be actual and not theoretical.'"  *Id.* (quoting *Wisc. Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985) (*per curiam*)).  Plaintiffs must also show that "[t]he injury complained of is of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm."  *Id.*; *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (the purpose of a preliminary injunction "is merely to preserve the relative positions of the parties" until a court can resolve the merits).  Since "a mere possibility of irreparable harm will not suffice," showing a likelihood of irreparable injury is sometimes considered "the *sine qua non* for obtaining a preliminary injunction – it is what justifies the extraordinary remedy of granting relief before the parties have had the opportunity fully to develop the evidence and fully to present their respective cases." *Cal. Ass'n of Priv. Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 167 (D.D.C. 2018) (citation omitted).

The Alaska district court has decisively ruled that mere issuance of oil and gas leases on Alaska's North Slope does not justify preliminary injunctive relief.  *See Gwich'in Steering Comm. v. Bernhardt*, No. 3:20-cv-204-SLG, 2021 WL 46703 (D. Alaska Jan. 5, 2021).  Against the same concerns raised here about irretrievable commitment of resources, damage from exploration and other ground-disturbing activities, and aerial overflights and other alleged harassment of wildlife and human visitors, the Alaska court found plaintiffs (including The Wilderness Society) "have not established a likelihood that those activities will occur before the Court issues a final ruling on the merits," particularly given the fact that BLM would have to

undertake further analysis and issue further authorizations for future on-the-ground actions. *Id.* at *7-8.

Retracing and fortifying the analysis leading to the aforementioned ruling starts with the observation that conducting a lease sale and issuing a lease(s) are merely preliminary steps in an oil and gas program and do not authorize any ground disturbance. *See id.* at *8. This is evident both from the governing IAP and from relevant BLM regulations. *See* 2025 IAP ROD at 9 (explaining that the ROD does not itself authorize any specific on-the-ground activity associated with the exploration for or development of oil and gas, and that such actions require separate BLM approvals); 43 C.F.R. Part 3130 (describing separate regulatory stages for leasing, exploration, and production). The Alaska court's ruling extended holdings from other courts that merely conducting an oil and gas lease sale does not result in the irreparable harm to the environment necessary for granting a preliminary injunction. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544-45 (1987) (reversing a preliminary injunction regarding oil and gas leases because "injury to subsistence resources from exploration was not at all probable"); *Tribal Vill. of Akutan v. Hodel*, 859 F.2d 662, 664 (9th Cir. 1988) (dissolving a preliminary injunction regarding an oil and gas lease sale and finding that "none of the activities of the lease sale stage results in harm to the environment"); *Blanco v. Burton*, No. Civ.A. 06-3813, 2006 WL 2366046, at *15-19 (E.D. La. Aug. 14, 2006) (denying an injunction and finding that holding an offshore oil and gas lease sale did not result in imminent environmental harm); *N. Slope Borough v. Minerals Mgmt. Serv.*, No. 3:07-cv-45-RRB, 2007 WL 1106110, at *4 (D. Alaska Apr. 12, 2007) (denying a preliminary injunction regarding an oil and gas lease sale).

An additional important aspect of the Alaska court's ruling is the recognition that the failure to demonstrate irreparable injury caused by lease issuance does not foreclose a court's

ability to, "if warranted, order appropriate equitable relief at the merits stage." *Gwich'in Steering Comm.*, 2021 WL 46703 at *9; *see also* n.91 ("Relief may include, in an appropriate case, the rescission of leases.").  In essence, "the filing of this suit acts as a lis pendens on the lease sale."  *N. Slope Borough v. Andrus*, 486 F. Supp. 326, 331 (D.D.C. 1979).

Plaintiffs' "best" (if not only) case is *Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983).  *See* Pls.' Br. 25.  But that case is plainly distinguishable from the case presented here.  It closely resembles the Ninth Circuit's decision in *Conner v. Burford*, 848 F.2d 1441, 1447 (9th Cir. 1988), which was featured by the Alaska plaintiffs in *Gwich'in Steering Committee*.  The Alaska court's ruling correctly seized on the key difference that *Conner* involved "the sale of gas leases that did not prohibit surface occupancy[.]"  *Gwich'in Steering Comm.*, 2021 WL 46703 at *9.  And the same was true in *Peterson*, where "in issuing these leases the Department made an irrevocable commitment to allow *some* surface disturbing activities, including drilling and roadbuilding."  *Sierra Club v. Peterson*, 717 F.2d at 1414-15.  More fundamentally, the holdings in *Conner and Peterson* were specific to NEPA – the courts there concluded that NEPA analysis must be conducted prior to the issuance of leases without NSO stipulations, because such lease issuance is an "irretrievable" commitment of resources.  That NEPA question is not presented here – *Conner and Peterson* "concerned whether a specific agency action required an EIS; [they did] not mandate the finding that the issuance of such leases establishes an irreparable harm at the preliminary injunction stage."  *Gwich'in Steering Comm.*, 2021 WL 46703 at *9.

Avoiding this case law was likely one of Plaintiffs' reasons for commencing this civil action in the District of Columbia instead of Alaska.  Another likely reason is Plaintiffs' desire to recirculate factual contentions that the Alaska court has previously rejected in denying motions to preliminarily enjoin NPR-A activities.  Specifically, an array of declarations was offered in

support of motions seeking to preliminarily enjoin the Willow Project, alleging irreparable harm

to subsistence uses, recreational/aesthetic interests, and commercial "wilderness" guiding

activities. *See Sovereign Iñupiat for A Living Arctic v. Bureau of Land Mgmt.*, Nos. 3:23-cv-58-

SLG and -61-SLG, 2023 WL 2759864, at *7-10 (D. Alaska Apr. 3, 2023). Even though that

motion sought to halt ground-disturbing work occasioned by BLM's approval of a master

development plan, plaintiffs raised arguments about anticipated "negative impacts from the

extraction of oil and gas over the lifetime of the Willow Project." The court rejected those

arguments because the motions before it involved "planned Winter 2023 Construction Activities

[that] do not include the extraction of any oil and gas." *Id*. at *7. Put differently, Plaintiffs'

efforts here, through some of the same declarants, fall even further short of their heavy burden to

demonstrate irreparable injury at the leasing stage.

As if all of this was not clear enough, developments in the ongoing Alaska litigation

demonstrate that other North Slope litigants recognize the inadvisability of seeking to

preliminarily enjoin an NPR-A lease sale. The February 20, 2026, joint scheduling motion filed

in *Center for Biological Diversity* (D. Alaska Case No. 3:20-cv-206-SLG), reflects an apparent

choice by plaintiffs to avoid revisiting a motion for preliminary injunction before the Alaska

court, in furtherance of reaching agreement on a somewhat expedited schedule for an APA

record review case intended to facilitate entry of a final judgment "before surface disturbing

activities may be authorized for the winter of 2026-27 pursuant to the new IAP or in newly

leased areas." Ex. 2 at 3.

In sum, Plaintiffs' motion must be denied for the same reasons explained by the Alaska

court in January 2021. Issuance of North Slope oil and gas leases does not provide a basis for

finding irreparable injury, because such leases do not authorize ground-disturbing activity. Without being able to show a likelihood of irreparable injury, Plaintiffs' motion must be denied.

## II.    Plaintiffs Are Unlikely to Succeed on the Merits

Plaintiffs' Motion must also be denied because Plaintiffs fail to demonstrate they are likely to prevail on the merits.  Plaintiffs advance two claims in their Motion that conflate two separate but related issues.  The first involves the existence and nature of BLM's historical discretion under the Petroleum Reserves Act to make areas *available* for leasing and to determine under *what terms and conditions* leasing occurs – and BLM's loss of that discretion with the passage of the OBBBA and disapproval of the 2022 IAP under the Congressional Review Act.  The second involves BLM's discretion in deciding which parcels to offer *in a particular sale,* where BLM has broad discretion and has never said otherwise.  Properly understood, these claims are both easily rejected.[4]

The Court can address the likelihood of success on the merits of these claims without having the complete administrative record before it.  *See Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579 (D.C. Cir. 2001).  Plaintiffs' claims can be substantially, if not entirely, reviewed as a matter of statutory interpretation.  And there are ways to address the merits prong of a motion for preliminary injunction before the full administrative record is available.  *See, e.g.*, *Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, No. 20-cv-3817 (CKK), 2021 WL 430054, at *7 (D.D.C. Feb. 7, 2021) (citing *American Bioscience* and proceeding to consider the likelihood of success on the merits where the parties agreed that relevant agency documents,

---

[4]    Plaintiffs' Complaint also includes NEPA claims.  *See* Compl. ¶¶ 85-92 (Third Claim), ¶¶ 93-96 (Fourth Claim).  But these arguments are not raised in the Motion.  The acronym "NEPA" appears in Plaintiffs' Brief only in the list of acronyms.  *See* Pls.' Br. at v.

which would be part of the administrative record, when finalized, had been filed in conjunction

with the preliminary injunction proceedings); *see also* 5 U.S.C. § 706 (allowing judicial review

on either "the whole record or those parts of it cited by a party").[5]

A.    The Agency Decisions Did Not Rest on a "Misinterpretation" of the OBBBA

Adoption of the 2025 IAP and issuance of the 2026 Notice of Lease Sale were

reasonable, and certainly not arbitrary and capricious.  Plaintiffs' claim, that a "foundational

legal error" caused BLM to feel "obligated" to offer any specific lease tract in a particular sale,

lacks legal support and ignores the record.  *See* Pls.' Br. 17.

Plaintiffs' argument hinges on the contention that a purported "obligat[ion]" to make

TLSA lease tracts available for leasing in the March 2026 lease sale "was BLM's operating

premise."  *See id*., and at 19.  But this argument is derived from a single sentence in the closing

paragraph of the nine-page TLCROW cancellation decision.  That sentence states:

> Companies are looking to conduct exploration activities in the area covered by the
> TLCROW this winter and the BLM is obligated to include the area covered by the
> TLCROW within those areas available for potential leasing in accordance with
> Section 50105 Public Law 119-21.

Pls.' Mot. for Prelim. Inj., Ex. 20, Dkt. 14-22, at 10.

Plaintiffs' argument necessarily fails, most fundamentally, because Plaintiffs reference

the TLCROW cancellation decision as their basis for finding error in a separate and distinct

agency decision, *e.g*., the February 2026 Notice of Sale.  Pls.' Br. 16.  These are independent

---

[5]    A rigid application of *American Bioscience* would be problematic – while it addressed
the denial of a motion for preliminary injunction, finding a likelihood of success on the merits
sufficient to grant a preliminary injunction in the absence of an administrative record would
seem at least equally problematic.  Put differently, it cannot be that a full administrative record is
always required to deny a motion for preliminary injunction, any more than the absence of an
administrative record can be a basis for granting one.

agency actions.  Absent some incorporation by reference or other obvious connection (not present here) a purported error in one action is not a basis for finding a different action to be unlawful.  Rather, this Court must look to the Notice of Sale (or 2025 IAP ROD) itself to determine the agency's basis and reasons for acting.

Even putting that disconnect aside, Plaintiffs' argument fails because the referenced sentence simply reflects that the OBBBA directed the Secretary of the Interior to make the lands covered by the TLCROW *available* for oil and gas leasing, under the same terms and conditions provided in the 2020 ROD.  Put differently, maintaining the TLCROW's prohibition against oil and gas leasing would prevent BLM from complying with the OBBBA's express directive to "expeditiously restore and resume oil and gas lease sales . . . in the areas designated for oil and gas leasing as described in the [2020] NPR–A final environmental impact statement and the [2020] NPR–A record of decision."  OBBBA §§ 50105(a), 50105(b).  And the 2020 IAP ROD "makes approximately 18,581,000 million acres of the approximately 22.8 million acres of subsurface managed by BLM in the NPR-A *available* for oil and gas leasing."  2020 IAP ROD at 3 (emphasis added).[6]

Plaintiffs' suggestion that the purported misinterpretation caused BLM to believe that it had to offer *every acre in every sale* is thus a non sequitur.  *See* Pls.' Br. 18 ("BLM cannot simultaneously maintain that the 2020 EIS grants it discretion to phase and limit individual sales and that Section 50105 stripped that discretion entirely").  Nowhere has BLM said that it no longer has discretion to choose which available parcels to offer in any particular sale, or to phase

---

[6]    Available at https://eplanning.blm.gov/public_projects/?doc=%2F117408%2F200284263%2F20032151%2F250038350%2FNPR-A%20IAP%20Record%20of%20Decision.pdf (last viewed Feb. 27, 2026).

and limit individual sales.  The Detailed Statement of Sale plainly reflects BLM's awareness of such discretion and rebut Plaintiffs' theory.  The Secretary did not feel obligated to offer every parcel in the former TLCROW in this sale.  *See* Pls.' Br. 18.  If Interior thought it was obligated to lease every acre that the 2020 IAP ROD made available for leasing in every sale, it would not be offering only a portion of that acreage.  Thus, even if Plaintiffs are correct in their reading of the cancellation decision, it does not provide a basis for a likelihood of success in challenging the sale itself – which plainly did not follow that asserted position.

Plaintiffs cite a handful of cases for the abstract principle that an agency decision violates the APA if based on the erroneous belief that the agency lacks discretion and "erroneously believes it is bound to a specific decision."  Pls.' Br. 17 (quoting *United States v. Ross*, 848 F.3d 1129, 1134 (D.C. Cir. 2017).  But these cases address the limited circumstance where the erroneous view of the law results in the agency abdicating any exercise of judgment.  *See Prill v. NLRB*, 755 F.2d 941, 947 (D.C. Cir. 1985).  As noted above, the Secretary clearly exercised judgment, which included the choice about which lands to offer for in the upcoming lease sale (but not about which lands would be available for leasing in the NPR-A, since Congress made that choice in the OBBBA).  The "erroneous view of the law" manufactured by Plaintiffs cannot be reconciled with this sale.

Plaintiffs pursue a similar tangent in suggesting that BLM's statutory interpretation must overcome the presumption against implied repeals.  *See* Pls.' Br. 18.  Aside from the fact that, again, BLM never asserted it lacked authority or discretion as to which lands to *offer in a lease* sale (subject to Section 50105(c) of the OBBBA), this argument – characterizing the OBBBA as "aimed at lease sales" and not the underlying management plan, *see* Pls.' Br. 19 – is directly contrary to the language of Section 50105 of the OBBBA, misunderstands the process by which

the BLM executes lease sales, and how BLM applied Congressional direction. Plaintiffs urge

that the repeated references to the IAP in Section 50105 are only "intended to define where sales

may occur and what terms apply." *Id*. But, as BLM has explained in every IAP since at least

2013, those are two of the main decisions made by the BLM in an IAP.[7] The IAP decisions

identify which lands may be offered for lease and what stipulations or required operating

procedures would apply to leases that are purchased. Nowhere in the cancellation decision or the

2025 IAP did BLM claim that Section 50105 repealed provisions in the Petroleum Reserves Act

that require protection of surface resources in the NPR-A, nor did BLM assert that Section 50105

reinstated the 2020 IAP.[8] Rather, the BLM correctly interpreted Section 50105 to constitute

Congressional direction about implementation of the Petroleum Reserves Act. As such, Section

50105 constrained BLM's approach in deciding where leasing is made available in the NPR-A

---

[7]    *See e.g.,* 2013 IAP ROD at 1 ("The plan includes decisions regarding . . . making areas available or unavailable for oil and gas leasing… stipulations and best management practices [to] regulate permitted activities in NPR-A . . .") available at https://eplanning.blm.gov/public_projects/?doc=%2Fnepa%2F117408%2F168999%2F205600% 2FNPR-A_FINAL_ROD_2-21-13.pdf (last viewed Feb. 27, 2026); 2020 IAP ROD at 2 ("The plan includes decisions regarding… making areas available or unavailable for oil and gas leasing . . . stipulations and ROPs [to] regulate permitted activities (stipulations attach to oil and gas leases and apply only to oil and gas lease holder activities) in NPR-A . . ."); 2022 IAP ROD at 2-3 ("The plan includes decisions regarding . . . making areas available or unavailable for oil and gas leasing . . . stipulations and ROPs [to] regulate permitted activities (stipulations attach to oil and gas leases and apply only to oil and gas leaseholder activities) in NPR-A . . .") available at https://eplanning.blm.gov/public_projects/?doc=%2F117408%2F200284263%2F20058238%2F 250064420%2F2022_NPRA_IAP_ROD_508.pdf (last viewed Feb. 27, 2026); 2025 IAP ROD at 3 ("The plan includes decisions regarding . . . making areas available or unavailable for oil and gas leasing . . . stipulations and ROPs [to] regulate permitted activities (stipulations attach to oil and gas leases and apply only to oil and gas leaseholder activities) in the NPR-A . . .").

[8]    Note however, that the joint resolution disapproving the April 2022 IAP Record of Decision ROD under the Congressional Review Act enacted just five months after the OBBBA, did reinstate the 2020 IAP ROD. *See*, Pub. L. No. 119-47, 139 Stat. 696 (Dec. 5, 2025).

and the "lease form, lease terms, economic conditions, and stipulations" that the BLM could apply to those leases.  *See* OBBBA §§ 50105(b), (d).

Plaintiffs' statutory construction argument relies on a contrived, inaccurate framing of the Department's position and is directly contradicted by the documents Plaintiffs themselves cite. They therefore cannot show a likelihood of success on the merits of their claim that the Department made a fundamental legal error.

      B.    <u>Plaintiffs Misapprehend the OBBBA and the Petroleum Reserves Act</u>

Plaintiffs' second argument reflects a similarly flawed reading of the Petroleum Reserves Act and the OBBBA.  *See* Pls.' Br. 20-24.

 Plaintiffs speak only generally of the Petroleum Reserves Act "conservation mandates" but fail to grapple with the fact that in the OBBBA, Congress directly addressed how BLM must approach decisions related to future leasing in the NPR-A and what "conservation measures" should be applied.  Specifically, Section 50105(b) requires leasing to occur in the areas designated for oil and gas leasing in the 2020 IAP EIS and the 2020 IAP ROD and Section 50105(d) mandates that leasing be conducted pursuant to the "same lease form, lease terms, economic conditions, and stipulations" as described in the 2020 IAP EIS and IAP ROD. OBBBA §§ 50105(b), (d).  Therefore, once the OBBBA was enacted, BLM was required to issue an IAP that reflected the oil and gas leasing framework set out in the 2020 IAP ROD.  If the 2025 IAP were to adopt more stringent "conservation measures" as Plaintiffs suggest is required by the Petroleum Reserves Act, such decisions would directly contradict the more recent and more specific direction in the OBBBA.[9]

---

[9]    This should be distinguished from Plaintiffs' argument addressed in II.A above, at 15-16. Again, BLM does not assert that is obligated to offer every available acre in every lease sale

Plaintiffs advance a similarly flawed assertion that BLM "entirely failed" to even consider applying the Petroleum Reserves Act "conservation mandates." *Id*. at 20-21.[10]  This argument is hard to follow – Plaintiffs acknowledge that the 2025 IAP contained "protective measures" but apparently argue that BLM omitted a step of determining whether those measures "actually satisfy the [Petroleum Reserves Act] conservation mandates, including the maximum-protection standard for the TLSA and the requirement to mitigate significantly adverse effects on surface resources." *Id*. at 21.  The 2025 IAP plainly includes measures designed to address the Petroleum Reserves Act requirements, and Plaintiffs fail to explain what more was required, particularly at the leasing stage.  *See NAEC I*, 457 F.3d at 976.

Even if Congress had not set the requirements for oil and gas leasing in the NPR-A in the OBBBA, Plaintiffs' argument would still fail to account for the increasingly settled proposition that the relevant provisions only require adoption of measures that BLM determines to be necessary and appropriate.  *NAEC II*, 983 F.3d at 1081; *Ctr. for Biological Diversity*, 141 F.4th at 1002.  The Wilderness Society was reminded of these principles roughly a month ago when the Alaska district court denied its motion seeking to preliminarily enjoin NPR-A exploration activity – "The [Petroleum Reserves Act] does not require BLM to prevent all impacts to surface resources in the TLSA or elsewhere in the NPR-A.  BLM can satisfy the [Petroleum Reserves Act's] maximum-protection directive with mitigation measures that the Secretary deems necessary or appropriate."  *Sovereign Iñupiat for A Living Arctic v. Burgum*, No. 3:25-cv-356-

_____

(though it must comply with the minimum acreage provisions in Section 50105(c)).  But BLM has limited discretion regarding the availability of certain lands for leasing and the terms and conditions of leases it issues.

SLG, 2026 WL 215560, at *6 (D. Alaska Jan. 27, 2026) (internal quotation marks and citations omitted).

Plaintiffs' argument that the 2025 IAP unlawfully reverses position without explanation is similarly unavailing. *See* Pls.' Br. 23. The 2025 IAP does identify instances where it is effectuating a change in policy or a position on a particular issue. *See*, *e.g.*, 2025 IAP ROD at 5 n.1 (explaining that certain guidance has been rescinded, including guidance issued on January 16, 2025); at 5-7 (describing Special Area changes and boundary modifications). A host of measures were changed that arose from, or were retained in, the 2022 IAP. *See id*. at 12-13. Aside from adequately discussing these changes, the 2025 IAP ROD clearly explains that the IAP complies with the Congressional direction in Section 50105 of the OBBBA, which provided specific guidance on which areas should be available for lease and what terms, conditions and stipulations the BLM could require for those leases. *See id.* at 11. The ROD further explains that under the BLM is prohibited by the Congressional Review Act "from reissuing the 2022 IAP ROD in substantially the same form or issuing a new IAP that is substantially the same as the 2022 IAP ROD." *Id*. (citing 5 U.S.C. § 801(b)(2)). This prohibition applies equally to the 2013 IAP, since it is functionally the same as the 2022 IAP.

Finally, Plaintiffs advance a "void comparator as justification" argument. Pls.' Br. 24. This argument seemingly suggests that it was error to adopt the 2025 IAP by comparing it to the 2022 IAP. But this argument is devoid of any legal authority identifying the manner in which the APA allows a court to evaluate whether a decision is "measured . . . against the actual baseline." *Id*. And Plaintiffs do not suggest how BLM should have otherwise conformed its analysis to address Congress's December 2025 disapproval of the 2022 IAP under the Congressional Review Act, which became law during the final stages of issuing the 2025 IAP.

Plaintiffs have not shown a likelihood of success on the merits, and their motion should be independently denied on this basis.

### III.    The Balance of Equities and Public Interest Favor Defendants

Plaintiffs must finally also prove that their requested preliminary injunction would serve the public interest. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). When the government is a party, the analyses of the public interest and balance of equities merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) ("the government's interest *is* the public interest"). When addressing these factors, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (citation omitted).

The Court need not reach these factors, but here again, Plaintiffs apparently seek to avoid prior decisions by the Alaska court. That court found that economic interests in resource development as well as the agency's determination on the proper balancing of multiple uses weighed against entering a preliminary injunction against NPR-A oil and gas development. *Sovereign Iñupiat*, 2023 WL 2759864, at *11-12. The court further recognized that local residents offered differing views (than those of Rosemary Ahtuangaruak) on the effects of development on subsistence hunting, and declined to find that modest development "would be against the interest of most subsistence uses." *Id*. at *13. Additionally, the court considered "state and federal legislative pronouncements" that favored development. *Id*. at *14. For similar reasons here, Plaintiffs fall short of their burden to show that the balance of the equities and public interest favor granting a preliminary injunction.

## IV.    Any Injunction Must Be Narrowly Tailored

The Court should deny Plaintiffs' motion, and therefore need not consider the scope of any injunctive relief. However, if the Court does reach this question "injunctive relief should be no more burdensome . . . than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 862 (2025) (Thomas, J., concurring) ("In no circumstance can a court award relief beyond that necessary to redress the plaintiffs' injuries."). Plaintiffs' brief offers no analysis of this issue, concluding with the request "that the Court enjoin the sale of leases" on identified tracts constituting a great majority of the lease sale. Pls.' Br. 36. But in addition to providing for an injunction on issuing oil and gas leases, Plaintiffs' proposed order also requests, "[t]o the extent any leases are issued," an injunction preventing BLM "from approving or authorizing any ground-disturbing activities on those leases[.]" Prop. Order 1, Dkt. 14-47. Here again, Plaintiffs disregard basic legal principles clarified by *Gwich'in Steering Committee*. There too, plaintiffs sought an order enjoining lease issuance, as well as approval of "seismic or other ground-disturbing activities[.]" *Gwich'in Steering Comm.*, 2021 WL 46703 at *6. The Alaska court found that it lacked jurisdiction (and was unable to enter injunctive relief) until BLM had taken action to approve such activities. *Id*. Once BLM issues such an approval, "Plaintiffs are not precluded from seeking injunctive relief at that time." *Id*.

Finally, should the Court be inclined to order any injunctive relief, the Court should require Plaintiffs to post security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R.

Civ. P. 65(c).  The Court has broad discretion in determining the proper amount of the bond.  *See*

*DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).

## **CONCLUSION**

For all these reasons, the Court should deny Plaintiffs' Motion for a Preliminary

Injunction.

Respectfully submitted this 27th day of February 2026.

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

*/s/ Paul A. Turcke*
PAUL A. TURCKE (Idaho Bar # 4759)
Trial Attorney, Natural Resources Section
1290 West Myrtle Street, Suite 500
Boise, ID 83702
(202) 532-5994
paul.turcke@usdoj.gov

*Counsel for Defendants*

*Of Counsel*:

JOSHUA HANSON
JASON HARTZ
Office of the Solicitor
United States Department of the Interior

24